IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION
IN ADMIRALTY

| | |
|---|---|
| MAGGIE HOLDINGS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No.: 9:04-22933-23 |
| v. ) | |
| ) | **FINDINGS OF FACT AND** |
| ROBERT LONG and P/Y GEDON, ) | **CONCLUSIONS OF LAW** |
| her electronics, appurtenances, engines, ) | |
| apparel, etc., in rem, ) | |
| ) | |
| Defendants. ) | |
| ) | |

This matter was tried without a jury on Wednesday, May 30, 2006. The court – having heard the arguments, read the briefs of counsel, and considered the evidence, including the testimony of live witnesses, deposition testimony, and exhibits – makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

1.     Plaintiff Maggie Holdings, LLC ("Maggie Holdings") owns the motor yacht, the "Lady Nancy." Nancy and Jim Hudson ("the Hudsons") are the sole shareholders of Maggie Holdings.

2.     The Lady Nancy is a 112-foot, model year 2003, Broward raised bridge motor yacht. Construction on her began in 2001, and she was completed and delivered to Maggie Holdings in 2003. The purchase price for the Lady Nancy was $3,700,000.00, and she is currently on the market for $5,600,000.00.

3.     Slakoff, Cramer & Associates, Marine Surveyors and Consultants, prepared a Survey Report on the vessel, dated July 28, 2003, and July 30, 2003. According to this Survey Report, the

market value of the Lady Nancy at that time was $4,500,000.00, and the replacement value of the Lady Nancy at that time was $5,900,000.00.

4.      The Lady Nancy is never leased or chartered.  Rather, the Hudsons use the Lady Nancy solely for their personal enjoyment.

5.      On or about May 22, 2004, Nancy Hudson and some friends had been aboard the Lady Nancy.

6.      Mrs. Hudson and her friends departed the Lady Nancy on May 23, 2004, while the Lady Nancy was docked in a slip at the Harbor Town Marina in Hilton Head Island, South Carolina.

7.      Defendant Robert Long ("Long") owns the "Gedon," a 62-foot, model year 1986, aluminum Lazy Days houseboat with a modified V-hull, high bow, and twin Volvo diesel engines.  Long purchased the Gedon in or about 1996.

8.      Long testified that on May 23, 2004, he had been out with friends on the Gedon for about two or three hours before he returned to the Harbor Town Marina.  Upon returning, Long asserts that the controls either jammed or locked into the forward position, causing the Gedon to allide with the stationary Lady Nancy.

9.      After the allision, Long was able to reverse the Gedon and back it into neutral, and then reverse so he could back the Gedon into her slip.  Long testified that he cannot explain the alleged problems with his controls and that he did not have the controls repaired or inspected following the incident.

10.     Long denies any negligence; however, he admits that he is liable for the appropriate and reasonable damages incurred by Plaintiff, the legal owner of the Lady Nancy.

11.     During the allision, the bow of the Gedon struck the side of the Lady Nancy, resulting

in damages to both the bow of the Gedon and the port side of the Lady Nancy.

12. The bow of the Gedon was pushed in, requiring approximately $15,000.00 to $16,000.00 in repairs for the bow to be pulled out, rewelded, and repainted.

13. Photographs of the Lady Nancy taken some time after the incident depict an approximate four-inch break in her port side, with a depression of approximately two-and-a-half by two feet.

14. At the time of the incident, the Lady Nancy had a two-person crew, consisting of Captain J.R. Klassen and a housekeeper, Diane Carroll. Captain Klassen notified the Hudsons of the damage to the Lady Nancy.

15. On June 2, 2004, the Lady Nancy entered Thunderbolt Marine, Inc. ("Thunderbolt") in Savannah, Georgia, for repairs.

16. Ralph John Heil, Jr. ("Heil") was the operations manager for Thunderbolt when the Lady Nancy was there for repairs. Heil was not involved directly with the repairs to the Lady Nancy; however, he provided testimony, via deposition, regarding the repairs.

17. While the Lady Nancy was at Thunderbolt, a dispute arose as to the extent of painting required to properly repair her hull. As a result, Thunderbolt contacted Eve Marine Surveyors for an opinion as to the extent of painting required. In his letter to Thunderbolt, Thomas M. Eve ("Eve") stated that "it will be necessary to repaint the port side of the vessel." (Jt. Ex. 9.3.)

18. In his deposition, Eve was asked why painting the entire hull would not be necessary. Eve responded, "The dent is just simply one dent representing a small percentage of the exterior volume of the vessel and in painting one side it would more than adequately address the repair." (Jt. Ex. 9.1.)

19. Captain Neil H. Haynes, CMS, AMS, CMI ("Captain Haynes") testified live as an expert witness for Defendants. Captain Haynes testified that it would have been reasonable to paint only a large enough area around the damage to blend in the paint with the rest of the hull. Captain Haynes further testified that painting the entire portside of the hull would have been more than sufficient.

20. The Lady Nancy was originally painted with Awlgrip, a professional marine topside paint system. Heil testified that Thunderbolt's customary practice when painting a large boat was to tape down the middle of the bow and paint one side at a time. Heil further testified, however, that if one side of a boat was painted in 2001, and the other side was painted in 2004, with the same color but from different patches of paint, there was a possibility of slight color differences between the two sides.

21. Ultimately, Plaintiff had both sides of the hull repainted, and the Lady Nancy was at Thunderbolt from June 2, 2004, until June 27, 2004, for a total of 25 days. The painting of both sides of the Lady Nancy required that it be tented, and the tenting took approximately two weeks.

22. Heil testified that Thunderbolt did not encourage crews to live aboard boats that were in the shipyard for repairs, but that crews could remain aboard so long as the boat had holding tanks and did not discharge waste water into the shipyard. The Lady Nancy has holding tanks.

23. Thunderbolt does not allow crews to remain aboard when it is unsafe to do so, such as when the boat is in the paint building.

24. Thunderbolt does not ensure the safety of personal items aboard boats while they are in the shipyard; rather, the security of personal items is the responsibility of the owner and the crew.

25. Plaintiff asserts that it incurred additional expenses as a result of the need to move

all valuables off the Lady Nancy.

26.     An invoice from Thunderbolt, dated June 21, 2004, includes $56,328.96 worth of repairs to the portside, and a second invoice, dated June 28, 2004, includes $19,037.49 worth of repairs to the starboard hull.

27.     Some time in April of 2005, the Lady Nancy experienced blistering and corrosion under the stainless steel rub rails.  Plaintiff asserts that this occurred as a result of Thunderbolt's failure to remove the rub rails before painting the vessel.  Rather than returning the Lady Nancy to Thunderbolt to remedy the situation, however, the Hudsons had the blistering and corrosion repaired at Broward Marine.  A Broward Marine work order dated April 5, 2005, includes a charge of $6,840.00, and a second work order, dated August 11, 2005, includes a charge of $24,858.00.  Plaintiff seeks recovery of these amounts, asserting that the corrosion occurred as a result of Thunderbolt's improper painting procedure.  However, Defendants assert that the corrosion was a pre-existing condition, as evidenced by the June 21, 2004, Thunderbolt work order, which includes a charge of $3,375.00 for "[ ], prime & fair metal corrosion & blisters porthull tops."  (Jt. Ex. 3.)

28.     The court finds that it would have been reasonable and sufficient to have only the portside of the Lady Nancy painted, rather than both hulls.

29.     The court further finds that the actual painting of only the portside would have taken approximately seven days, for which Plaintiff is entitled to payment for room, but not board, for both Captain Klassen and housekeeper Carroll at the rate of $200.00 per day.

30.     The court finds that it is the usual and customary practice in the motor yacht industry to pay the captain and the crew a yearly salary, without regard to whether the vessel is on charter or off charter, and as such, Plaintiff is not entitled to reimbursement for those expenses.

31.     The court finds that Plaintiff is not entitled to payment from these Defendants for the corrosion-related repairs made at Broward Marine.

## CONCLUSIONS OF LAW

1.      The court has jurisdiction over this matter because it involves damages arising from an accident on the navigable waters of the United States and/or is covered by the Admiralty Extension Act, 46 U.S.C. § 740.

2.      In admiralty cases, damage less than total loss is compensated by reference to cost of repairs. *See Hewlett v. Barge Bertie*, 418 F.2d 654, 658 (4th Cir. 1969) (citing Gilmore & Black, Admiralty 436; *Pan-American Petroleum & Transport Co. v. United States*, 27 F.2d 684, 685 (2d Cir. 1928)).

3.      In admiralty, an award of damages rests in the sound discretion of the court, and giving or withholding damages is predicated upon enlarged principles of equity and justice. *Hewlett v. Tug Evelyn*, 283 F.Supp. 917, 919 (4th Cir. 1968) (citing 48 Am. Jur., Shipping § 540, p. 367 (1943)).

4.      Here, the court finds that Plaintiff is entitled to damages in the amount of $56,328.98, as set forth in the June 21, 2004 Thunderbolt invoice, for the cost of painting the portside of the Lady Nancy. Plaintiff is not entitled to payment for the cost of painting the starboard side of the Lady Nancy or for the corrosion-related repairs made at Broward Marine.

5.      Additionally, Plaintiff is entitled to payment at the rate of $200.00 per day for seven days each for Captain Klassen and housekeeper Carroll, for a total of $2800.00 ($200.00 x 7 x 2).

6.      Lastly, the court finds that because Defendants offered $53,085.11 to Plaintiff on July 28, 2004, and because Defendants made an Offer of Judgment in the amount of $53,100.00, plus

expenses, dated May 18, 2006, and filed May 20, 2006, that Plaintiff is not entitled to pre-judgment interest in this matter.

## CONCLUSION

It is, therefore, **ORDERED** for the foregoing reasons that Plaintiff is entitled to damages in the amount of $59,128.98 ($56,328.98 + $2800.00).

                 **AND IT IS SO ORDERED.**

                 _____
                 PATRICK MICHAEL DUFFY
                 United States District Judge

**Charleston, South Carolina**
**June 5, 2006**